May it please the Court, my name is Albert Sanders and I'm appearing today on behalf of plaintiff appellant Roberta B. Today we ask this Court to reverse the lower court's grant of summary judgment to the government on three grounds. First, the government applied the wrong legal standard to the breach of contract claim. Second, the lower court failed to credit the evidence that Ms. B offered in support of the contract claim. And finally, the CIA's determination was arbitrary and capricious. Pursuant to the service abroad agreement that Ms. B signed with the government, the government said very specifically that if Ms. B terminated her assignment that she would have to pay the expenses. Why isn't that clause kind of determinative of the events that later transpired? Well, Your Honor, the reason why that clause is not determinative is because the service abroad agreement necessarily incorporated the Foreign Affairs Manual and the State Department Housing Handbook. And these provisions were provisions that governed the government's responsibility to provide housing to Ms. B that was safe, adequate, and secure according to those particular standards. And the record is clear on this point. The government failed to do that. It never offered her a home that satisfied the applicable standards. But assuming that's true, so is your breach of contract argument that she didn't breach the contract because her performance was excused by the government's breach? Yes, Your Honor. Our argument is that the government engaged in a prior breach of the contract that excused Ms. B from performing thereunder. And what did they breach in the contract? I mean, I'm looking at the contract here. What is it that the government breached in the contract? Very clearly, they failed to provide Ms. B a housing assignment that satisfied the applicable standards. The Foreign Affairs Manual is incorporated into this particular agreement. And that manual provides for the standards that govern all agency housing for individuals serving abroad. Those standards were set forth by the State Department pursuant to congressional authorization in 1979. But even if we accept all of that, the agreement says that even, so in other words, even if the government were to have determined that she left for personal reasons that were of no concern to the government, as Judge Rader pointed out, the agreement says even under those circumstances, the government may waive the money, but it's not required to waive the money, right? Right. It's not required to, but it's not required to waive the travel expenses in that circumstance. But what it is required to do is provide Ms. B a house that satisfied the applicable standards. Now, the government cannot have engaged in behavior which essentially forfeited its duty and failed to comply with its duty to provide her a home and then say, well, the reason why we're saying that your service was not in the interest of the government was because you failed to stay in the post city or you failed to serve out your term when in the first instance, Judge Post, the government failed to provide her the opportunity to do that by failing to provide the home. And more to the point on the breach of contract issue is that the lower court failed to even analyze the claim whatsoever. At the core of this issue, as Your Honor has so adequately pointed out, is the contract between Ms. B and the United States. But nowhere is that contract mentioned or analyzed essentially in the lower court's opinion. There's a clear standard that applies to breach of contract, breach of contract calls of action. Was there a contract? Was the contract breached? Were damages suffered? That's an elementary inquiry that the court must make. And here the court didn't do that. What it essentially did was apply the agency review standard to the breach of contract. I'm having some trouble with this case. And part of that is because you've got two claims, a breach of contract claim and a review of agency action. But it seems to me your entire analysis or arguments with respect to breach of contract are nothing more than a review of agency action under the regs. And I think at one point the Court of Claims in the earlier proceedings seemed to have conflated the two as well. And if that's the case, if really the breach of contract claim is nothing more than a restatement of a review of agency action, in other words they breached it, why does the Court of Claims even have jurisdiction under the Tucker Act? Where's the money mandating regulation or statute inherent here? The Court of Claims has jurisdiction on two grounds. As you know, the Tucker Act provides for jurisdiction in circumstances where there's a money mandating statute and also where there's an expressed or implied contract with the United States. Right. I know the contract. Is there beyond the fact that there's a contract, is there a money mandating statute that's also at issue here? I don't see it. Yes, there is. And that statute is 5 U.S.C. Section 5722 and 5724. That's the Travel and Transportation Expense Reimbursement Act. And I'll quote a portion of the statute for you. That statute says that agency quote, shall pay from government funds the travel expenses of an employee transferred in the interest of the government from one agency station to another for permanent duty. That's Ms. B's situation. And as a matter of fact, when we argued below that this court had jurisdiction, that's the statute on which we relied. And that's the statute that the court considered when dismissing the government's motion to dismiss for lack of jurisdiction. So we argue that this case is appropriately before the court on that jurisdictional ground. And once the case is appropriately before the court, we must consider the fact that the court erred as a matter of law because there is indeed a contract. And there is indeed a contract claim here. And the court's failure to analyze the contract and failure to apply the appropriate legal standard, particularly at the summary judgment stage, was a versatile error. Ms. B did not have to set forth facts to demonstrate that she did not have to win on the merits at the summary judgment stage. What she had to do was demonstrate facts sufficient to show that she could prevail on her claim. And that's what she did. The lower court got into a weighing of the evidence and accrediting of the evidence. And in fact, it failed to give Ms. B's evidence the reasonable inferences it was required to draw under these circumstances since she was a non-legal party. Is there anything in the record to indicate how we got a calculation of up to $40,000? Because I know the hotel was very little. I mean, somewhere she claimed that she had paid for the travel back and forth to the tune of $7,000. What's the $40,000? Your Honor, Ms. B actually specifically requested that during the course of the agency review. And to my knowledge, the government may assert differently, but to my knowledge, we've never received any documentation with respect to how the $40,000 was calculated. And in any event, it was not appropriate for the government to charge her that $40,000 in the first instance, particularly where the government failed to provide the housing as we discussed earlier. One crucial point in the breach of contract matter where the court erred was by completely ignoring the evidence that Ms. B offered in support of her claim. Had the court, the court explicitly said, I'm going to ignore the affidavit. I'm going to ignore the deposition. And had the court even reviewed the affidavit that she offered, which was appropriately offered under the rules below, it would have been five facts in her favor. Number one, not a single one of the homes that the government offered to Ms. B was safe, secure, and habitable in accordance with the Foreign Affairs Manual regulations and also within the antiquated housing allowance. Number two. But I guess even if we reach this portion of your argument, I mean, she stayed at a hotel for, and the government was willing to pay for a certain amount of time, very little time, less than a month. Why is it even the issue whether or not they provide, is there something that's in the regulations that says that they have to provide her that housing within 30 days and if they don't, she's out? I mean, they were paying for her to have adequate housing at a hotel. So I don't even understand where the breach was if she left and didn't allow them enough time. I think there's something in her affidavit or whatever to suggest that clearly she understood that she might have adequate, they might find her adequate housing if she stayed longer. Judge Poshy raised relevant points. Number one, the classification of Ms. B answers that question. She was assigned to this East Asian post as a permanent change in station. Now, the government cites regulations that speak to the fact that it can allow employees to stay in hotels and that sort of thing, but those regulations specifically apply to individuals who are transferred for a temporary change in station. And those are individuals that Okay, so if someone in permanent change of station goes within five days, the place that the government has secured for her, which is fine, is not available. She can or he can just go back to the U.S. and say, you violated the regulations. I don't have to go here. I think if there were five days, Judge Post, I would agree with you that would be sort of unacceptable. But let's look at the facts here. Ms. B signed that service abroad agreement in July of the year before. The government had eight months to prepare a home for her. When she got there, she stayed for four weeks, and the government failed to provide a home during that nine-month span. And it's that... Wait, they didn't have to provide a home for the eight months she wasn't there. They didn't, but they certainly did have an obligation to look and try to find one, and the record demonstrates that they failed to do even that. There was no pool of approved housing for her to even select from when she arrived in the East Asian post city. So you're saying under the regs, she would have been justified to just take off, take the plane back the next day because there was no housing ready for her when she arrived. I'm not saying that. What I'm underscoring, respectfully, what I'm underscoring is the fact that the government here essentially failed to prepare for her arrival and failed to satisfy its obligations. The regulations don't say, you know, if a home is not available on the day you show up, you can go home. But they do say that the government has an obligation to provide employees housing that meet these standards at the earliest possible date, as soon as possible. And I agree with you, that date is not one day or two days or three days. It may not even be 30 days. But if the question here is, did Ms. B wait long enough, or how long did the government have, that's a question of fact, that respectfully is appropriate only for a jury and is not appropriate at the summary judgment stage. By the way, you do refer to the fact that you think your client is deserving of a jury trial here, but the Court of Claims doesn't have... Yeah, I misspoke, Your Honor. I apologize. I misspoke on that point. Unless the Court has a further question... Mr. Sanders, can you tell us the East Asian country? No, it's classified. Okay. Okay, then we'll save the rest of your time, Mr. Sanders. Thank you. May it please the Court. Before I get started, I would like to just correct one statement that is identified in the reply brief that is inaccurate. And just for the record, there is a statement on page 12 of the reply brief that the government admitted that the foreign or the FAM and the housing manual that are identified here, that the government admitted during the proceedings below that those were part of the contract. It simply isn't the case. But they're referred to, aren't they? They're referred to, and the government did acknowledge that those two documents were in effect at the time of Ms. Roberta B.'s assignment, but in terms of that meeting... Are you now saying that there was no contractual obligation at all? Or isn't the question that she acted reasonably in getting, I think the record says, fed up after a month? The contract is what is identified on Joint Appendix page 35, which is the CERPS Abroad Agreement. The reply brief suggests that the government acknowledged below that in addition to the terms that are written in the agreement itself, that the government admitted that these other, the FAM and the housing agreement were, or the housing regulations were incorporated into this contract. In defendant's motion to dismiss filed on January 26, 2004, and which are document entries number 13 and 15, the government expressly argued that, in fact, they were not incorporated, and the government never made it into some kind of admission that the FAM was somehow a contractual document. But the Court of Claims concluded that, right? I mean, the Court of Claims seemed to incorporate all of the regulatory requirements into the contract. The trial court seemed to just sort of look at everything as a whole without, and in fact... Were you arguing that their findings of fact and law were incorrect? Well, in terms of... I think the court, in the end, came to the right result that, in fact, there was no breach of agreement here by the CIA. But it did seem to conflate the two different arguments that... Did you make that argument in your brief? We did, Your Honor. Yes, we talked about count one being... And that these provisions in the State Department manuals or whatever they are, the housing provisions and the transportation provisions, don't apply to this petitioning? Well, what we argued, Your Honor, was with count two, which is the contract claim. We did argue in our brief that the FAM and the housing regulations are not a part of the contract, that these are policy documents, and, in fact, the... Did you pay her transportation costs either way? No, Your Honor. The agreements are set forth in the Service Abroad Agreement, and that provides for Ms. B to serve her tour of duty for at least, I believe it's a 12-month period, and that is... I can't understand what you're complaining about. Are you saying that there was no contractual obligation to provide adequate housing, but there was an obligation to provide some sort of shelter, or what? There are two different issues here, Your Honor. First, there is a claim under the regulations that Ms. B has cited, the housing manual and the FAM. Those set forth the policies of the CIA in attempting to locate appropriate housing for its covert operatives, and those policies are fairly broadly stated, and they are identified as objectives and policies and the efforts that the CIA hopes to achieve. I'm trying to understand why you're pressing this point. Your Honor, I was simply trying to correct in the statement in the reply brief to the extent that it would make any difference to the Court in its decision. I wasn't trying to create a controversy that I didn't need to. I just was trying to correct something that I thought might make a difference in the case, given particularly the discussion that already occurred. Well, but if you're saying there was no obligation to provide satisfactory, secure housing, I assume that that's why you've raised the point. Well, Your Honor, in fact, the issue here is whether or not, first, there is a money mandating statute or regulation that would provide the trial court or jurisdiction to determine that, whether there is a contractual basis, a contract claim, a breach of contract claim, that Ms. B has properly brought before the court. Why isn't the money mandating statute that provision that was cited by the other side sufficient? Well, first of all, Your Honor, neither one of those statutes was cited in the briefing here. I do not have a copy of 5 U.S.C. 5724, but I do have a copy of 5 U.S.C. 5722, and I don't see any language in that statute that says the agency shall pay. It says an agency may pay from its appropriations, and the expenses are conditioned upon, payment expenses are conditioned upon, in 5 U.S.C. section 5722B, the operative's entry of the And so, I, unfortunately, just don't know where the shall language exists. It wasn't cited in the briefing, and I do not have a copy of the other statute. Well, in your view, does an employee have recourse for alleged violations of the FAM, the regulation? Well, there is a process that is set forth in the FAM that, although Ms. B says it wasn't followed here, in effect, she got the benefits of it. I mean, what typically happens, if we look at the FAM, which is at page 125 through 127 of the Joint Appendix, there is basically an appeals procedure, and during the, the person can challenge the housing that they've been given, and during that challenge, they can be placed in temporary housing, such as a hotel, and that's in 6 FAM 722.4-3, and that's essentially what happened here. I mean, Ms. B was placed in a hotel at government expense during her stay there, and although she complains that she shouldn't have had to stay in a hotel, the FAM seems to contemplate that that's exactly what could happen. I mean, what would have happened if she'd come to town, and the house that she was supposed to have been in burnt down? You know, a hotel would have probably been the only alternative then, until alternative housing could have been found, but this is, you know, a covert employee in a covert operation in a third world country, allegedly, supposedly a third world country, she alleges in her brief, and in the, some of the appendix pages, that this was a type 3 terrorist threat level country, so certainly things are going to happen, and the FAM seems to contemplate the activities that will occur to try to deal with that, including the provision of temporary housing. Here, Ms. B stayed for about three and a half weeks, and then told the agency she was going to leave, despite the fact that after she announced that she was going to leave, the agency did find a house that they thought would be acceptable, and she declined to even look at it, because she... It doesn't say that. It says they found, the agent came up with another, after the 28 houses, there was a 29th, and she was fed up and went home. That's correct, Your Honor. This doesn't say that the next one was any better, or solved everything, or had been the, she never saw it, apparently. We can't know, Your Honor, because Ms. B did not go to look at it. Exactly. She only let the process, she didn't let the process go to completion, she certainly didn't complete the appendix. I'm trying to understand, first she goes to the Board of Contract Appeals, so the government takes the position you're in the wrong place, you shouldn't be here, you have a contract, the Federal Circuit affirms, so then she goes to the Court of Federal Claims. So you're not arguing now that she's in the wrong court. Your Honor, I believe what the, the government did not argue at the BCA, that she's in the wrong place. That was a referral to the, pursuant to statute, the administrator for GSA is authorized to review, to settle claims regarding transport and relocation expenses. The referral, he referred it to GSBCA, which conducted that analysis. The, because it was not a CDA case, this Court found that, in fact, that decision was not appealable, but did not preclude potential review in another court. So there was no argument before the BCA that they were in the wrong place, it was just Ms. B did not like the result there, but that there was no appellate review of that decision, and so that's when the Court of Federal Claims became involved in it. Mr. Lester, after Ms. B returned home, there seems to have been considerable reforms in the housing process in this country. Why aren't those relevant to whether or not she received proper treatment while she was in the country? Are you referring to the renovation of the house that she had originally been offered? I'm referring to after she got back, they made some changes, according to her allegations, in the housing security upgrades were made to compound housing and things of that nature. Well, I think our position certainly was that, regardless of any upgrades that may have been made, it certainly doesn't affect Ms. B's situation and whether or not the agency had a reason to be in that case, but in addition to that, we get back to the initial argument in our initial brief, which relates to whether or not a court can even review these matters, the security issues that she claims here, that the agency violated. Her claim here really is that her housing was not safe. It wasn't disputed that only one of the houses was in a compound. There's no acknowledgment that there was any obligation by the agency to place her in housing that was within a compound. Are you saying there was an obligation on her to accept housing that, on its face, could at least be arguably insecure? She's acting, we're told, as a covert agent in a part of the world that is, without knowing which part exactly, has not been so stable as far as the United States Embassy employees are concerned. Well, Your Honor, Ms. B's allegation is that housing was not sufficiently secure or safe for her liking. However, this is a determination that the CIA has to make, and it is something that, particularly because of the covert nature of it, I mean, obviously we already have information that's deleted here because it's classified. But the question is, did she act reasonably in view of what was discovered? At least the record says that she requested such a transfer. She wasn't there against her will. She went willing to serve, and according to her statements, it got to the point where she felt obliged to leave. I think another question is the calculation of the sum, which sounds quite strange for just travel for a person or two people back and forth. Well, let me try to answer both of those questions first with regard to the substantive question rather than the monetary question. The substantive question, if this court would have to, or the trial court would have to step into the CIA's thinking about what security measures are appropriate and necessary in a type three terrorist level country in order to determine whether or not the security measures that the CIA offered this particular covert employee to determine whether those were sufficient or not.  Well, I don't know. That's not so clear on the record because I think facts were not disputed as to, I think the only question really ought to be, was her action so unreasonable, or who should bear the cost of failures on both sides? Well, Your Honor, I mean obviously Ms. B signed up to be a covert employee in an East Asian country. Obviously, people know when they do that there are going to be certain threat levels. The CIA makes determinations about what security levels are necessary. Courts simply, as the Egan case from the Supreme Court discusses, courts simply are not in position to second guess these types of security determinations by the CIA and make evaluations about whether bars were necessary in a particular place or not. I don't think that's the issue before us. The question is, was her action so unreasonable that this heavy financial load is to be borne only by her? Well, with all due respect, Your Honor, I think that's the first argument in our appellate brief is about whether or not the court actually can step into that security quagmire. But with regard to your question about the monetary amount, you're correct, there is nothing in the record specifically about how that amount is calculated. But it's my understanding that this is for relocation expenses, so this would include likely, although again it's not in the record, likely the cost of moving her to this area. So the cost of shipping clothing items, furniture, things like that. Was she given an accounting as far as you know? Well, Your Honor, there was no dispute before the trial court about the specific amount and so no evidence was developed at the trial court about the amount. She says it should be zero. Well, that's correct. In which case. But there was no specific challenge to the manner in which it was calculated or how the amount came about. The challenge was to whether or not it should be imposed at all. And there's been no challenge in the initial brief by the appellate here in terms of the specific amount. It has just been with regard to whether it should be imposed at all. I see my time is up, Your Honor. Any more questions? For these reasons, we ask the court to approve the trial court's decision. Thank you, Mr. Lexham. Mr. Sanders. Thank you, Judge Newman. The bottom line here and what you heard from the government, Your Honor, is this. At no point during this whole ordeal has the government ever alleged or stated that the housing options it provided Ms. B were safe, adequate, and habitable according to the standards. They never made that allegation. And if they did make that allegation, it would be a question of fact. That's inappropriate for summary judgment. Moreover, during the course of the agency's review, the agency didn't conduct any sort of investigation, didn't speak to anyone that was in the post city. How can a court substitute its judgment for that of the agency on security matters? Respectfully, Your Honor, we're not asking the court to substitute its judgment for the agency with respect to security. We're just asking the court to acknowledge what the agency has indicated, what the CIA has indicated. None of these particular homes satisfy the appropriate standards. And if that's the case, then Ms. B cannot have been found to breach this particular contract. And if there are more questions of fact with respect to that point, then it's something that's inappropriate at the summary judgment stage, particularly under the contract analysis. I'd like to address one point with respect to whether or not Ms. B acted reasonably under circumstances. The government underscored the fact that she was there in the post city for almost four weeks. That's true. But she didn't get up and just leave precipitously. Ms. B was a 20-year employee of the CIA. This was a significant career advancement opportunity for her. When she completed the tour successfully, as she had done before in a dangerous Latin American country, she would have been entitled to early retirement, retirement annuities, and several other things. The bottom line is that after conducting this extensive search, she only left when the government's real estate agent said to her, you're not going to find any housing in this city that satisfies the standards unless two things happen. One, the government increases the antiquated housing allowance, which hadn't been increased in almost seven years. Or two, grants an exception to the square footage limitation. She was entitled to rely on the government's own real estate agent's assessment that she wouldn't be able to find housing in the post city. Moreover, the foreign affairs manual, the appeals procedure, the government can't argue that the appeals procedure was relevant and applicable to the situation when the government's own representatives refused to allow Ms. B to pursue that procedure. Ms. B on her own wrote the interagency housing appeals board. She petitioned the chief of base on several occasions. And all throughout the process, throughout her extensive search, she kept the agency informed. When she went back to the government and said, sir, what I'd like to do is see if we can pursue an appeal of the situation. The chief of base's words were, no, we're not going to pursue an appeal because, quote, I don't want to walk the boat. The state department housing officer said, we're not going to pursue an appeal because to do so would be essentially futile because they're rarely granted or they're too time consuming. So the government can't stand here today and argue that because she didn't pursue the appeal, her calls of actions have no merit. Your Honor, with that said, we ask the court to reverse the lower court's grand assembly judgment for the government for the reasons we've identified here today. Thank you. Thank you, Mr. Sanders. Ms. Selester, the case is taken under submission.